**TO:** Ms. Aleta Trauger, Judge (US District Court, Middle District Of Tennessee)

**FROM:** Stephen Hugueley, Tennessee Death Row Prisoner

**DATE:** April 22, 2019

**RE:** "Administratively Closed" Case No. 3:11-cv-1115

RECEIVED
in Clerk's Office
MAY 06 2019
U.S. District Court
Middle District of TN

Dear Judge Trauger,

Attached you will find my latest correspondence with the Warden(s), and TDOC Commissioner, Mr. Tony Parker; I feel that I have been more than reasonable, and patient in my efforts to resolve this matter; Please review, and consider this latest correspondence in your consideration of allowing my case to be reopened; I apoligize for not being able to send you copies of the reports mentioned in this latest correspondence, the Federal Public Defenders Office only sent me enough copies to send to the Warden(s), Unit Manager, Counselor, and the institutional PsyD (Dr. Dina Kulenovic).

Thank you for your time, and I hope to hear from you in the very near future.

Thank you
Sincerely,

Stephen Hugueley #112195
RMSI/ 2-A-201
7475 Cockrill Bend Blvd.
Nashville, TN
　　　37209

**TO:** Mr. Tony Mays, RMSI, Warden
Mr. Ernest Lewis, RMSI, AWOS
Mr. Brandon Watwood, RMSI, AWOT
Mr. Michael Keys, Unit Manager (Death Row)
Mr. Tony Parker, TDOC Commissioner
Ms. Aleta Trauger, Judge (US District Court, Middle District of Tennessee)
Ms. Amy Harwell, Chief Assistant Federal Public Defender
Mr. Paul S. Davidson, Attorney (Waller Lansden Dortch & Davis, LLP)

**FROM:** Stephen Hugueley #112195

**DATE:** April 22, 2019

RECEIVED
in Clerk's Office
MAY 0 6 2019
U.S. District Court
Middle District of TN

In regards to the correctional officials to which this is being sent, you may be happy to know that this will be my last direct correspondence with you on this matter, I have more than exceeded the courts requirements to try and resolve this on an institutional level; In a separate correspondence which I have sent to you via the institutional messenger mail dated April 22, 2019 you have received the following two (2) papers: Washington University Journal of Law & Policy: Psychiatric Effects of Solitary Confinement (January 2006); and Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics (2010). These two papers should be more than needed to provide you with the facts on the negative effects of long term segregation, and it would be safe to assume that experts would agree that these effects are compounded when you add in the severity of a death sentence. Should you need more information I have provided you with a list of references at the end of this letter to help you better understand the psychological effects of segregation on prisoners, those effects are not only experienced by me on death row, but also those on units 1 & 3; Perhaps this is a matter that should be addressed for the entire TDOC, being that segregation units within the TDOC have tripled in number in the last 10-15 years, and now the State of Tennessee has well over one thousand prisoners on it's segregation units, and the financial incentive (the TDOC receives more money for a segregated prisoner than they do for a non-segregated prisoner) to have more segregated prisoners will no doubt lead to more inmates being placed on segregation. With that said.

I meet ALL of the TDOC and Institutional guidelines for a level. I have been four (4) years without a disciplinary report, and I have made an effort to be in complience with unit rules and regulations, which is more than can be said for the dozen or more inmates who have had, lost and regained their levels in the last four (4) years. I would like to have my chance at a regular level, however, if it is your intention to keep denying me the same rights and opportunities that you have given to other death row prisoners, you should at the very least start a new level (See attached Revised Restricted B-Level proposal); The personal property I am seeking on this new level would act as an alternative to the many psychological and emotional benefits that come with having a regular level, and it would help to alleviate the added stress that is a recognized result of long term segregation.

According to attorneys, as of January 2019 EVERY inmate on this unit other than myself, and the newest inmate Urshawn Miller #455407 has had a level ( Miller would have had a level already had he not tested positive for drugs). Taking into account the most recent assault on death row, there are now eleven (11) C-Level, one (1) B-Level, and forty-four (44) A-Level inmates on this unit, and according to records approximately 90% of inmates on death row have had, lost and regained their levels at some point; Even inmate Henry Hodges #102143 was an A-Level until approximately 1994 at which time he cut another inmates throat, since that time inmate Hodges has assaulted several guards, and committed other acts that have kept him from regaining a level. I unlike Henry Hodges have NEVER had a level, therefore, unit managements, and the prisons administration making comparisons between the two of us in relation to our ability to have a level or our conduct since being sentenced to death are unwarranted, since coming to death row I have NOT committed ANY violent acts toward inmates or staff, and I have certainly done nothing that would warrant punishment for life, which is exactly what you are attempting to impose upon me.

In the last year or two Unit Manager Keys has started writing on my level review that I am being denied a level for the "safety and security" of the institution, etc. I cannot help but think that this is a joke since I have offered to point out a few "holes" in death row security and he told me to my face in his office in app. February or March 2017 that he does NOT want to know what the "holes" are, and this administration has refused my many offers to point out the numerous "holes" in the death row units security; You state that you do not want me to have a level for "security" purposes, yet you do not want to know what the "holes" in security are, thus far no one has exploited the "holes" in the security so you play the role of an ostrich, burying your head in the sand refusing to acknowledge the "holes" hoping no one takes advantage of them. You use "security" as a blanket to discriminate against me, and yet you refuse to plug the "holes" in security on the death row unit, TDOC Policy states that "security", that is, these "holes" in death row security are non-grievable, therefore, the only option would be to address these "holes" in court since the current administration chooses to try and utilize "security" as a blanket to discriminate against me.

"Security" was NOT an issue when I was receiving unrestrianed contact visits from 2002–app. early 2014, nor was "security" an issue when the prison administration agreed in an email to my attorneys to start letting me get unrestrained contact visits with my family and friends, along with other privileges; How can you now with a straight face claim "security" when at the time the agreement was made I had not been disciplinary free for long.

Fact is, the prison administration acting capriciously without cause chose not to uphold their end of the agreement which was made with I and my attorneys, and, now that I have been disciplinary free for four (4) years you want to invoke and use "security" as the blanket to discriminate against me.

At the present time I am the **ONLY** inmate who was sentenced to death that has been excluded from the level system from the beginning. You claim that it is due to my history before being sentenced to death, this is not a legitimate claim, or cause since you currently have one inmate (Nicholas Sutton) who was sentenced to death for murdering a fellow TDOC prisoner

walking around with an A-Level, and you arm him with screwdrivers, hammers, etc.; Prior to getting off of death row inmate Joel Schmeiderer was sentenced to death for murdering a fellow TDOC prisoner, yet you gave him an A-Level, he even assaulted a guard on death row, lost his level and then regained his A-Level. **Can you honestly say that there is no discrimination of any kind dierected toward me?**

Many of those currently on death row have lost their levels numerous times only to regain them, some with assaults on both guards and inmates, others for drugs, having sex on visits, having sex with employees; and, it should be noted that I do not think it is a coincedence that the last two inmates caught having sex on visit, or with an emplyee were African American inmates, one of which was not punished in any way [he still has his A-Level] because no one wanted to create a record of a death row prisoner having a female employee bent over a table on the recreation yard having sex with her, and the other inmate now has his A-Level back and is once again having contact visits. I have NEVER had an issue related to recreational drugs or visitation and I am denied the opportunity to have unrestrained contact visits with my family and friends, while these two African American inmates are still allowed to have unrestrained contact visits with their family, and friends. It is this type of obvious disparity in the opperation of Tennessee's death row, especiallly in the last few years that makes me think that there is at the very least a small amount of racism directed toward me.

In recent years the courts and other States have recognized the fact that long term segregation is psychologically and emotionally damaging; I have been segregated for seventeen (17) years, and not only have I started suffering psychologically and emotionally, my physical health along with my eye sight has been effected because of the seventeen (17) years I have been confined in a small space. Long term segregation is damaging, this is NOT a conjecture on my part, this is a fact that Tennessee courts recognized even in the 1980's when the death row level system was brought about; It is also why many States have started doing away with long term segregation, some have done so willingly, while others have been made to do so by the courts.

The current administration took over this facility in early 2017 and since that time the death rate at this facility has more than doubled, the suicide, and attempted suicide rate is far greater than that of other prisons with triple the population, I do not believe it would be difficult for any court, or unbiased observer to see a correlation between the increase of these things and the current administrations method of opperating this facility; The same can be said for the opperation of unit 1 & 3, the assault rate (most of which are probably labeled as something other than what they are to cover up the increase), death rate, suicide, and attempted suicide rates are far greater on these two units than the majority of Tennessee segregation units outside of Riverbend, any court looking at these things could not help seeing that these incidents only started to really increase after the current administration took over. Long term segregation, and the stress associated with it along with the current manner in which this prison is being opperated has led to the needless deaths of prisoners, at a rate greater than that of many prisons who have triple the number of inmates; The fact that these deaths have occured should be a signal to everyone that something needs to change.
3 of 5

Case 3:11-cv-01115   Document 28   Filed 05/06/19   Page 4 of 8 PageID #: 245

Thank You
Sincerely,

*[signature]*
Stephen Hugueley #112195

CC: Ms. Dina Kulenovic, PsyD, RMSI Clinical Director
Mr. Warren Tate, Counselor (death row)

## —References—

1. Madrid v. Gomez, 889 F. Supp. 1146 (N.D. Cal. 1995), *rev'd and remanded*, 150 F.3d 1030 (9th Cir. 1998).
2. Libby v. Commissioner of Corrections, 432 N.E2d 486 (Mass. 1982)
3. *See* Stuart Grassian & Nancy Friedman, *Effects of Sensory Deprivation in Psychiatric Seclusion and Solitary Confinement*, 8 INT'L J.L. & PSYCHIATRY 49 (1986); Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AM. J. PSYCHIATRY 1450 (1983).
4. *Langley v. Coughlin*, 715 F. Supp. 522 (S.D.N.Y. 1989); and *Langley v. Coughlin*, 709 F. Supp. 482 (S.D.N.Y. 1989), aff'd, 888 F.2d 252 (2d Cir. 1989).
5. *Baraldini v. Meese*, 691 F. Supp. 432 (D.D.C. 1988), *rev'd sub nom.*, Baraldini v. Thornburgh, 884 F.2d 615 (D.C. Cir. 1989).
6. *Hameed v. Coughlin*, 57 F.3d 217 (2d Cir. 1995)
7. *See* Richard H. Walters et al., *Effects of Solitary Confinement on Prisoners*, 119 AM. J. PSYCHIATRY 771 (1963).
8. Reyes H: the worst scars are in the mind: psychological torture. Int. Rev Red Cross 89:591– 617, (2007).
9. Basoglu M, Livanou M, Crnobaric C: torture vs. other cruel, inhuman and degrading treatment: is the distinction real or apparent? Arch Gen Psychiatry 64:277– 85, (2007).
10. Patterson RF, Hughes K: Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999–2004. Psychiatriatric Serv 59:677–81, (2008).
11. White T, Schimmel D, Frickey R: A comprehensive analysis of suicides in federal prisons: a fifteen-year review. J Correct Health Care 9:321–43, (2002).
12. International Covenant on Civil and Political Rights. Available at http://www1.umn.edu/humanrts/instree/b3ccpr.htm.
13. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Puishment. Available at http://www1.umn.edu/humanrts/instree/h2catoc.htm.

# Restricted B-Level
**ONLY** for inmates who are permanently excluded from receiving regular A & B Levels. **Must** be disciplinary free for twenty four (24) months; Level **may** be lost for class A or B disciplinary conviction, dependent upon the seriosness. **NO** Unrestrained contact with staff/employees or inmates.

**Visitation:** <u>Unrestrained</u> contact visitation with family, friends, and attorneys; Restraints will be removed through hole in door after inmate is secured in visiting room with visitors (This is like a regular B-level); Visits will be limited to four (4) hours on weekends, and holidays (This is like A-Level). Visitors **WILL** be allowed to purchase food items from vending machines for visit (This is like regular A & B Levels). *These type of unrestrained visits pose absolutely no threat to inmates or staff, and are exactly the type of visits I received in the past.*

**Recreation:** Daily for 90 minutes. Restricted B-Level will **NOT** be allowed to have recreation in cages with other inmates (A & B Levels are allowed to have recreation in cages with other inmates);

**Mail/Packages:** Inmates on Restricted B-Level in addition to holiday, and seasonal food packages will be allowed to receive personal property packages during the months of January, April, July, October. (this is like A-Level)

**Personal Property:** In addition to the normal property allowed, Restricted B-Level inmates will be allowed to have the following "Unique/Special" personal property items: TDOC Policy #504.01 Inmate Personal Property, Page 2, Section F, states: *"...Inmates sentenced to death may receive (personal property) items that are UNIQUE to that particular group."* (these items pose absolutely NO security concern, and approval is within the Wardens discretion, and are an alternative to the many other benefits received on regular A & B Levels, and are ment to help alleviate the psychological and emotional stress of long term segregation) **ONLY** Restricted B-Level will be allowed to have these personal property items:

**1 – 24" flat screen television** (NO Smart TV's) NOTE: We are currently allowed to have 15" flat screens, the overall dimensions of the 24" are minimal, it is only 6" wider and approximately 2½" taller. TV will fit through "pie-flap" (Dimensions of LG 24" flat screen 21.9"W x 13.6" H x 2.1"D) on Amazon.com

**1 – Preloaded (NO cartridges needed) TV Game Console** (These consoles have no internet, ethernet capabilities) Choices limited to:
> **Sony PlayStation Classic** with 2 controlers, AC Power adapter, game memory card, and extra HDMI cord.
> **Nintendo SNES Classic Edition Game** with 2 controlers, AC Power Adapter, and extra HDMI Cord.
> **Nintendo NES Classic Edition** with 2 controlers, AC Power Adapter, and extra HDMI cord.

**40 – Compact disc** (We are currently allowed twenty [20], an additional twenty [20] would help to reduce some of the psychological and emotional stress associated with long term segregation).

**Arts & Crafts:** Restricted B-Level inmates will be allowed the same approved in cell arts & crafts items as regular B-level; Attorneys for indigent inmates will be allowed to order in cell arts & crafts items for them; All items must be approved in advance.

Stephen Hugueley #112195
RMSI/ 2-A-201
7475 Cockrill Bend Blvd.
Nashville, TN
       37209

NASHVILLE TN 320

22 APR 2019 PM 2 L



RECEIVED
in Clerk's Office

MAY 06 2019

U.S. District Court
Middle District of TN

LEGAL MAIL



TO: Ms. Aleta Trauger, Judge
US Courthouse, Room 825
801 Broadway
Nashville, TN
       37203–3816

MAILED: April 22, 2019

